# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PABLO A. ZENTENO and MARIA J.
ZENTENO,

     Plaintiffs,

v.                                 Case No. 8:17-cv-2591-WFJ-TGW

BANK OF AMERICA, N.A.,

     Defendant.

_____

MANUEL BLANCO and LIXIS
QUINTOSA,

     Plaintiffs,

v.                                 Case No. 8:17-cv-2626-WFJ-SPF

BANK OF AMERICA, N.A.,

     Defendant.

_____

PEDRO PABLO COLLAZO CRUZ
and ODALYS RODRIGUEZ,

     Plaintiffs,

v.                                 Case No. 8:17-cv-2627-WFJ-SPF

BANK OF AMERICA, N.A.,

     Defendant.

_____/

## ORDER

Plaintiffs allege Bank of America ("BOA") committed fraud when servicing Plaintiffs' applications for the Home Affordable Modification Program ("HAMP") in the wake of the 2008 financial crisis. Before the Court today are the following cross-motions for summary judgment in three individual cases: *Rodriguez*, Dkts. 225 and 228; *Zenteno*, Dkts. 248 and 251; and *Blanco*, Dkts. 229 and 232. All parties filed several responses and replies: *Rodriguez*, Dkts. 229, 230, 231; *Zenteno*, Dkts. 252, 253, 254; and *Blanco*, Dkts. 233, 234, 235, 239, 240. With the benefit of oral argument and full briefing, the Court grants summary judgment in favor of Defendant BOA on all claims and denies Plaintiffs' motions for summary judgment in their entirety.

## BACKGROUND

### I.    Factual Background

This opinion involves three sets of Plaintiffs from three cases: (1) Pablo and Maria Zenteno; (2) Pedro Pablo Collazo Cruz[1] and Odalys Rodriguez; and (3) Manuel Blanco and Lixis Quintosa. All Plaintiffs had mortgages on their homes that were serviced by BOA. Like many Americans, Plaintiffs experienced economic difficulties in the wake of the 2008 financial crisis. This ultimately led

---

[1] Mr. Cruz passed away in May 2018. *See Rodriguez*, Dkt. 158 at 2. The Court previously granted summary judgment in favor of Defendant BOA and against Mr. Cruz because of his death. *Id.* at 7–8. Because Ms. Rodriguez is the only remaining plaintiff in the case, the Court will refer to it as the *Rodriguez* case, despite the parties referring to it as the *Cruz* case.

2

Plaintiffs to seek financial relief through HAMP—a program implemented by the

United States government in March 2009 to help homeowners facing foreclosure.

**A. Plaintiff Zenteno**

Plaintiff Zenteno and his wife, Maria Zenteno, executed a mortgage with

Defendant BOA in November 2005 for their home in Tampa, Florida. *Zenteno*,

Dkt. 250-3. As a result of the 2008 financial crisis, the Zentenos began falling

behind on their mortgage payments in December 2008. *Zenteno*, Dkt. 250-12.

Plaintiff Zenteno and his wife submitted a letter to BOA stating: "[t]he reason I

had fell behind with the monthly payment is because, last year in Nov. 2007 my

job slow down drastically and wasn't enough income come in." *Zenteno*, Dkt. 250-

31. Plaintiffs contacted Defendant BOA by phone sometime in 2009 requesting a

loan modification through HAMP. *Zenteno*, Dkt. 100 at 10.

According to Plaintiff Zenteno, in November 2009, a BOA representative

told him by phone that he should refrain from making his regular mortgage

payments. *Id.* at 10. The representative allegedly stated that being "past due" on

the mortgage was a prerequisite for HAMP loan modification eligibility. *Id.* at 10–

11.

Defendant BOA provided Plaintiff Zenteno an application for a HAMP loan

modification in April 2010. *Id.* at 11; *Zenteno*, Dkt. 251, Ex. A. Plaintiff completed

the application and signed it on May 12, 2010. *Zenteno*, Dkt. 251, Ex. B. In a letter

3

dated May 26, 2010, Defendant BOA requested Plaintiff Zenteno send required documents missing from his application. *Zenteno*, Dkt. 251, Ex. C.

In November 2010, a BOA representative allegedly told Plaintiff Zenteno over the phone that his application materials were "not current." *Zenteno*, Dkt. 100 at 11. BOA representatives repeated these concerns about the status of Plaintiff Zenteno's application materials on subsequent phone calls. *Id.* at 11–12. Plaintiff Zenteno says he resubmitted his application and supporting materials more than four times. *Id.* at 12. "Plaintiffs did not receive any written verification that their HAMP modification application was ultimately received." *Id.* at 13.

In December 2010, BOA representatives allegedly told Plaintiff over the phone that he was approved for a loan modification under HAMP. *Id.* During this phone call, the BOA employees verbally told Plaintiff he should begin making "trial payments" of $1,438.81 pursuant to HAMP. *Id.* Plaintiff made three such trial payments. *Id.* at 13–14.

Plaintiff Zenteno alleges BOA charged fees for property inspections seventeen times from 2008 to 2012, despite Plaintiff living in the home then. *Id.* at 13.

On April 12, 2012, Plaintiff's home was foreclosed upon in a state-court proceeding. *Id.*; *Zenteno*, Dkt. 158-27. The state court entered a judgment against Plaintiff Zenteno for a total of $222,887.65, with $265 representing fees he

4

allegedly owed BOA for the property inspections. *Zenteno*, Dkt. 158-27 at 2.

Plaintiff Zenteno moved out of the home in 2016. *Zenteno*, Dkt. 100 at 14.

### B. Plaintiff Rodriguez

Plaintiff Rodriguez's story is similar to Plaintiff Zenteno's. In August 2007,

Plaintiff Rodriguez and Plaintiff Cruz executed a mortgage for their home in

Tampa, Florida. *Rodriguez*, Dkt. 103 at 10.  BOA soon began servicing the loan.

*Id.* After experiencing financial hardship, Plaintiff Rodriguez contacted Defendant

BOA by phone in 2009 to request a loan modification through HAMP. *Id.*

Defendant BOA provided a HAMP application to Plaintiff Rodriguez in August

2011.[2] *Id.* at 11. Plaintiff Rodriguez says she properly completed the application

and returned it to BOA. *Id.*

Plaintiff Rodriguez alleges many of the same interactions with BOA

representatives as Plaintiff Zenteno. In August 2011, a BOA representative

allegedly told Plaintiff Rodriguez by phone that she should refrain from making

her regular mortgage payments so as to qualify for HAMP. *Id.* at 10. In September

2011, BOA representatives allegedly told Plaintiff Rodriguez by phone that her

application for a HAMP loan modification was incomplete and that she needed to

---

[2] Although Plaintiff alleges in the Amended Complaint that she received the HAMP application from BOA in August 2011, Plaintiff later provided the Court with a letter from Defendant BOA that provided Plaintiff Rodriguez a HAMP application and was dated May 20, 2009. *Rodriguez*, Dkt. 228, Ex. A.

submit new application materials. *Id.* at 11. Then a BOA representative told Plaintiff on the phone that she was "approved" for a HAMP loan modification and should start making "trial payments" of $970.[3] *Id.* at 12. And BOA allegedly conducted twenty-three property inspections on the home from 2009 to 2012, all while Plaintiff lived there. *Id.* at 14.

Despite making six trial payments of $970 from 2010 to 2011, Plaintiff was unable to keep her home. *Id.* at 13. On May 15, 2012, a state court entered a foreclosure judgment against Plaintiff Rodriguez and her husband for a total of $290,899.04, with $361 representing fees they allegedly owed BOA for the property inspections. *Rodriguez*, Dkt. 141-17 at 3. Plaintiff Rodriguez moved out of the home in 2012. *Rodriguez*, Dkt. 103 at 14.

**C. Plaintiff Blanco**

Plaintiff Blanco alleges similar experiences to those of Plaintiff Zenteno and Plaintiff Rodriguez. In July 2007, Plaintiff Blanco and Plaintiff Lixis Quintosa executed a mortgage with Defendant BOA for their home in Tampa, Florida. *Blanco*, Dkt. 17 at 10.  After experiencing financial hardship, Plaintiff Blanco contacted Defendant BOA by phone in 2009 to request a loan modification through HAMP. *Id.* In August 2009, Plaintiff Blanco provided BOA an affidavit describing

---

[3] In the Amended Complaint, Plaintiff states this verbal approval for a HAMP loan modification occurred in September 2009, but she also alleges she completed her application for a HAMP loan modification almost two years later, in August 2011. *Rodriguez*, Dkt. 103 at 11, 12.

his financial hardship. *Blanco*, Dkt. 232, Ex. A. Defendant BOA provided a HAMP application to Plaintiff Blanco in 2010. *Blanco*, Dkt. 17 at 11. Plaintiff says he properly completed the application and returned it to BOA. *Id.; Blanco*, Dkt. 232 Ex. B.[4]

In December 2011, a BOA representative allegedly told Plaintiff Blanco by phone that he should refrain from making his regular mortgage payments so as to qualify for HAMP. *Blanco*, Dkt. 17 at 10. In March 2012, BOA representatives allegedly told Plaintiff Blanco by phone that his application materials for a HAMP loan modification were "not current." *Id.* at 12. A BOA representative told Plaintiff over the phone in November 2011 that he was "approved" for a HAMP loan modification and should start making "trial payments" of $972.90. *Id.* at 13. And BOA allegedly conducted thirty-four property inspections on the home from 2010 to 2012, all while Plaintiff lived there. *Id.* at 14.

Despite making three trial payments of $972.90 in 2011, Plaintiff was unable to keep his home. *Id.* at 14. On December 28, 2012, a state court entered a foreclosure judgment against Plaintiff Blanco for a total of $261,951.51, with $390 representing fees he allegedly owed BOA for the property inspections. *Blanco*, Dkt. 147-25 at 3. Plaintiff Blanco moved out of the home in 2011. *Blanco*, Dkt. 17 at 14.

---

[4] The HAMP application Plaintiff provided this Court is not dated. *Blanco*, Dkt. 232 Ex. B.

## II.     Procedural Background

Each set of plaintiffs allege Defendant BOA committed common law fraud[5] in four ways when servicing their HAMP applications:

> (1) By falsely telling Plaintiffs they could not be current on their mortgages to qualify for HAMP loan modifications and failing to tell them they could qualify for HAMP if default was reasonably foreseeable ("HAMP Eligibility Claims");

> (2) By falsely telling Plaintiffs the requested supporting financial documents Plaintiffs had submitted to BOA were missing ("Supporting Documents Claims");

> (3) By falsely telling Plaintiffs they were approved for HAMP modifications and needed to start making trial payments ("HAMP Approval Claims");

> (4) And by fraudulently omitting how inspection fees charged to Plaintiffs' accounts would be applied ("Inspection Fee Claims").

After litigation and delays due to the COVID-19 pandemic, the Court was prepared to begin a joint bench trial for these cases in July 2021. However, the Court canceled the trial and ordered the parties to file competing motions for

---

[5] The Eleventh Circuit has held that no private cause of action exists under HAMP. *Miller v. Chase Home Fin., LLC*, 677 F.3d 1113, 1116 (11th Cir. 2012).

summary judgment addressing whether Florida's Banking Statute of Frauds precludes Plaintiffs' claims and whether the special damages sought by Plaintiffs are proper fraud remedies. The Court now addresses these motions.

## LEGAL STANDARD

Summary judgment should be entered only if there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; it must be a *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* at 248.

If factual issues are present and they are material, the Court must deny the motion and proceed to trial. *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990).

## ANALYSIS

### I.    The Banking Statute of Frauds Bars the HAMP Approval Claims.

Florida's Banking Statute of Frauds prohibits a debtor from suing a creditor over a credit agreement unless the agreement: (1) is in writing, (2) expresses consideration, (3) sets forth the relevant terms and conditions, and (4) is signed by the creditor and the debtor. Fla. Stat. § 687.0304; *see also Bloch v. Wells Fargo Home Mortg.*, 755 F.3d 886, 889–90 (11th Cir. 2014). A credit agreement is defined as "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation." Fla. Stat. § 687.0304(a). To the extent verbal conversations add to a credit agreement, such additions are barred by the statute. *Bloch*, 755 F.3d at 889. The Banking Statute of Frauds applies to a wide variety of claim types, including fraud claims. *See Uribe v. Bank of Am., N.A.*, No. 8:17–cv–2589–T–33AEP, 2018 WL 2215498, at *3 (M.D. Fla. May 15, 2018) ("The banking statute of frauds is applicable to fraud claims where the borrower has alleged that the lender orally agreed to make financial accommodations to the borrower."); *see also Dixon v. Countrywide Fin. Corp.*, 664 F. Supp. 2d 1304, 1309–10 (S.D. Fla. 2009).

Here, pursuant to the Hamp Approval Claims, Plaintiffs allege that representatives of Defendant BOA "verbally informed Plaintiffs over the phone that they were 'approved' [for HAMP loan modifications] and requested they make

'trial payments'. . . pursuant to [HAMP]." *Zenteno*, Dkt. 100 at 13; *Blanco*, Dkt. 17 at 13; *Rodriguez*, Dkt. 103 at 12. Plaintiffs claim "[t]his statement was false, as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs." *Zenteno*, Dkt. 100 at 13; *Blanco*, Dkt. 17 at 13; *Rodriguez*, Dkt. 103 at 12.

The Court holds that the HAMP Approval Claims fall within Florida's Banking Statute of Frauds. The claims are based on Defendant BOA's alleged verbal representations that it would financially accommodate Plaintiffs by modifying their mortgages through HAMP. As Plaintiffs admit, loan modifications constitute credit agreements under the statute. *Rodriguez*, Dkt. 228 at 4; *Zenteno*, Dkt. 251 at 4; *Blanco*, Dkt. 232 at 5. Therefore, to be enforceable under the Banking Statute of Frauds, the loan modifications must be in writings that express consideration, set forth the relevant terms and conditions, and are signed by the creditor and the debtors.

In all three cases, Plaintiffs argue that these requirements under the Banking Statute of Frauds are satisfied by the aggregation of certain documents pertaining to HAMP. *Rodriguez*, Dkt. 228 at 4–7; *Zenteno*, Dkt. 251 at 4–8; *Blanco*, Dkt. 232 at 4–8. Plaintiffs are correct that several writings can be combined to satisfy the Banking Statute of Frauds, even when the writings on their own would not. *See Traver v. Wells Fargo Bank, N.A.*, No. 3:14-cv-895-J-32MCR, 2015 WL 9474612,

at *5 (M.D. Fla. Dec. 29, 2015) ("Florida state courts and other federal courts applying Florida law have also extended this rule by aggregating documents to determine whether there is a writing sufficient to satisfy Florida's Banking Statute of Frauds."). But, as explained below, each Plaintiff falls short of satisfying the aggregation doctrine.

### A. Plaintiff Rodriguez's HAMP Approval Claim

Plaintiff Rodriguez argues there are two writings that can be combined to satisfy the Banking Statute of Frauds in her case: (1) a letter from Bank of America—signed by the Senior Vice President of the Home Retention Division for Bank of America—that outlined the HAMP process and attached a HAMP application; and (2) Plaintiff's completed HAMP application affixed with her husband's signature.[6] *Rodriguez*, Dkt. 228 at 4–7. For the reasons explained below, these writings—even when aggregated together—do not satisfy the Banking Statute of Frauds.

First, these writings do not show that Defendant BOA ever approved Plaintiff Rodriguez or her husband for a HAMP loan modification. The language in the letter sent by BOA is overwhelmingly conditional. *Rodriguez*, Dkt. 228, Ex. A.

---

[6] Confusingly, the completed HAMP application that Plaintiff Rodriguez provides in support of her aggregation argument is dated September 10, 2012—over four months *after* the state court issued a final judgment foreclosing the home on May 15, 2012. *Compare Rodriguez,* Dkt. 228, Ex. B *with Rodriguez*, Dkt. 141-17 at 2.

For example, the letter states Plaintiff "may be eligible" for HAMP modifications and that Plaintiff must provide documentation "to confirm [her] eligibility and continue the modification process." *Id.* at 2 (emphasis added). The letter even states: "Please note that your modification will not be effective unless you meet all of the applicable conditions and you are notified in writing that your modification has been approved." *Id.* at 8. Plaintiff Rodriguez has pointed to no document that contains any express commitment by BOA to modify her mortgage through HAMP. Such conditional language cannot satisfy the Banking Statute of Frauds. *See Mark Andrew of the Palm Beaches, Ltd. v. GMAC Comm. Mortg. Corp.*, 265 F. Supp. 2d 366, 380–81 (S.D.N.Y. 2003) (applying Florida law and holding the Banking Statute of Frauds was not satisfied by an aggregation of documents that failed to show the creditor made an express commitment to the debtor), *aff'd* 96 F. App'x 750 (2d Cir. 2004).

Second, the aggregation doctrine contemplates that the documents at issue be executed "at or near the same time." *Collins v. Citrus Nat'l Bank*, 641 So. 2d 458, 459 (Fla. 5th DCA 1994) ("Where two or more documents are executed by the same parties, *at or near the same time*, in the course of the same transaction, and concern the same subject matter, they will be read and construed together.") (emphasis added). Here, Defendant BOA sent its letter to Plaintiff Rodriguez and her husband in May 2009. *Rodriguez*, Dkt. 228, Ex. A at 1. But Rodriguez's

husband sent BOA the completed HAMP application more than three years later, in September 2012, months after final foreclosure. *Rodriguez*, Dkt. 228, Ex. B at 1, 7. The Court declines to aggregate documents completed three years apart.

Finally, in *Bloch*, 755 F.3d at 889–90, the Eleventh Circuit held that the Banking Statute of Frauds barred claims related to HAMP even though the plaintiffs offered the following writings: (1) a letter from the bank-defendant inviting plaintiffs to apply for HAMP; and (2) the plaintiffs' completed HAMP application affixed with their signatures. These are the same writings offered by Plaintiff Rodriguez. The Eleventh Circuit stated: "It is undisputed there is no signed written agreement expressing consideration and setting forth the relevant terms and conditions of the purported HAMP modification." *Id.* at 890. So, too, here. Summary judgment is granted in favor of Defendant BOA on Plaintiff Rodriguez's HAMP Approval Claim.

## B.  Plaintiff Zenteno's HAMP Approval Claim

Plaintiff Zenteno offers three writings to support his aggregation argument: (1) a letter from BOA on April 21, 2010, inviting Zenteno to apply for HAMP and attaching a HAMP application; (2) Zenteno's HAMP application affixed with his signature; and (3) another letter from BOA dated May 26, 2010, stating that Plaintiff must submit documents so that BOA can complete its HAMP eligibility review. *Zenteno*, Dkt. 251 at 2.

14

Plaintiff Zenteno faces the same fate as Plaintiff Rodriguez. The writings offered by Zenteno do not evince BOA ever expressing a commitment to modify Zenteno's mortgage through HAMP. Zenteno offers the same two writings offered by Rodriguez, which contain the same conditional language explained above. *Zenteno*, Dkt. 251, Exs. A, B. The addition of the May 26th letter does not change the outcome. Indeed, this letter states BOA still needed to "verify [Zenteno's] eligibility to *begin* the process toward a [HAMP] loan modification." *Zenteno*, Dkt. 251, Ex. C at 1 (emphasis added). The Court grants summary judgment in favor of Defendant BOA on Zenteno's HAMP Approval Claim.

## C. Plaintiff Blanco's HAMP Approval Claim

Plaintiff Blanco offers several more documents than his peers to support his aggregation argument. These documents include:

- A handwritten hardship affidavit signed by Plaintiff Blanco in August 2009 to support his application for a HAMP loan modification (Exhibit A);

- An electronic application for a HAMP loan modification filled out and electronically signed by Plaintiff Blanco and his wife (Exhibit B);

- A cover letter from Defendant BOA enclosing a proposed agreement to modify Plaintiff Blanco's loan (Exhibit C);

- The same document as Exhibit C but signed by Plaintiff Blanco and his wife on October 31, 2010 (Exhibit D);

- A letter written and signed by Defendant BOA's Senior Vice President of the Home Retention Division stating that Plaintiff Blanco is eligible for a trial modification of his loan (Exhibit F)[7];

- A Trial Period Plan and Frequently Asked Questions about the proposed trial modification (Exhibit E).

*Blanco*, Dkt. 232 at 15–38.

The Court asked the parties for further briefing on these documents, particularly Exhibits C, D, E, and F, which do not contain any reference to HAMP. *Blanco*, Dkt. 236. Plaintiff Blanco responded:

> As for whether the documents are related to the HAMP Loan Modification Program, the Plaintiffs [sic] discovery requests and claims are only related to HAMP loan modifications. No other type of loan modification or refinance were ever requested. It was Plaintiffs' understanding and intention that all loan modification applications they made were related to the HAMP Loan Modification Program.

*Blanco*, Dkt. 239 at 1–2.

But Defendant BOA says these exhibits are not related to HAMP at all. *Blanco*, Dkt. 240 at 2–5. These documents are instead related to Plaintiff Blanco's application for a loan modification *outside* of HAMP. *Id.* at 4. BOA stated:

---

[7] The Court is listing Exhibits E and F out of alphabetical order to clarify that the cover letter (Exhibit F) included the Trial Period Plan (Exhibit E) as an enclosure in the correspondence.

> After being denied for loan modification assistance under HAMP, Bank of America reviewed the Plaintiffs' loan for an in-house loan modification. It was Bank of America's practice to continue reviewing Plaintiffs for other loan modification options after being declined under the HAMP program.

*Id.* at 3–4. According to BOA, Exhibit F is the letter offering Plaintiffs a trial plan for an in-house loan modification unrelated to HAMP. *Id*. at 4. Exhibit E included the requirements that Plaintiff Blanco must satisfy to complete the trial plan. *Id.* BOA stated that Plaintiff Blanco completed the trial plan successfully and was approved to apply for a permanent in-house loan modification. *Id.* Exhibits C and D are the cover letters enclosing the proposed agreement for a permanent in-house loan modification (with Exhibit D being the version signed by Plaintiff Blanco and his wife). This agreement required Plaintiff Blanco to complete the paperwork by October 8, 2010, to receive the permanent loan modification. *Blanco*, Dkt. 232, Ex. D at 1. But Plaintiff did not do so until October 31, 2010. *Blanco*, Dkt. 232, Ex. E at 5. Because Plaintiff missed this deadline, BOA denied his application for the permanent in-house loan modification. *Blanco*, Dkt. 240 at 5.

The Court finds Defendant BOA's explanation of these documents to be not in real contest. Plaintiff Blanco offers only the declarations of himself and his wife's "understanding and intention" to support his conclusion that Exhibits C, D, E, and F are related to HAMP. *Blanco*, Dkt. 239 at 1–2. But the records themselves do not support this. Whereas Exhibits A and B reference HAMP multiple times,

17

Exhibits C, D, E, and F do not mention HAMP once.[8] Defendant BOA has

authenticated these latter exhibits as being non-related to HAMP. Because Exhibits

C, D, E, and F are not related to HAMP or the alleged credit agreement at issue in

this case, the Court will not consider them for Plaintiff's aggregation argument.

　　　　This leaves Exhibits A and B. And, like his peers, Plaintiff Blanco fails to

provide any documents showing BOA ever expressly committed to modifying his

mortgage through HAMP. Exhibit A is an affidavit completed by Plaintiff Blanco

outlining financial hardships that could qualify him for HAMP. *Blanco*, Dkt. 232,

Ex. A. Exhibit B is Plaintiff Blanco's application to be considered for a loan

modification under HAMP. *Blanco*, Dkt. 232, Ex. B. Neither document contains a

signature from Defendant BOA. And both documents use the same type of

conditional language as the other Plaintiffs' HAMP application materials analyzed

above. *See, e.g.*, *id*. at 3 ("I understand that the Servicer will use the information in

this document to *evaluate my eligibility* for a loan modification[.]") (emphasis

added). These documents, even when aggregated, are not enough to remove

Plaintiff Blanco's claims from the Banking Statute of Frauds.

　　　　In sum, the HAMP Approval Claims brought by each Plaintiff are based on

credit agreements as defined by the Banking Statute of Frauds. Because these

---

[8] It is worth noting that the materials submitted by the other Plaintiffs all referenced HAMP, as well.

credit agreements are not in writing or signed by the Defendant, they do not have

any legal effect. Summary judgment is granted in favor of Defendant BOA.

## II.   The Banking Statute of Frauds Also Bars the HAMP Eligibility Claims and the Supporting Documents Claims.

Plaintiffs say the above finding should be limited to only the HAMP

Approval Claims. Plaintiffs argue that, even if the Banking Statute of Frauds bars

the HAMP Approval Claims, the three other claims should nevertheless survive

because those claims do not explicitly involve credit agreements as defined by the

statute. *Rodriguez*, Dkt. 228 at 8–9; *Zenteno*, Dkt. 251 at 8–10; *Blanco*, Dkt. 232 at

8–9.

Two cases lend Plaintiffs some support. Both cases arise from motions to

dismiss, a different consideration than here. In *Uribe*, 2018 WL 2215498, at *1, the

plaintiff brought the same four claims asserted by Plaintiffs here: the HAMP

Approval Claim, the HAMP Eligibility Claim, the Supporting Documents Claim,

and the Inspection Fee Claim. The court ruled that Florida's Banking Statute of

Frauds barred the HAMP Approval Claim because it was based on the bank's oral

agreement to approve the plaintiff's HAMP application, which constituted a

financial accommodation to the borrower as defined by the statute. *Id.* at *3. But in

addressing dismissal standards under Fed. R. Civ. P. 12(b)(6), the court ruled that

the other claims were not barred by the Banking Statute of Frauds because they

19

"[did] not involve a credit agreement as defined by the statute." *Id.* The court offered no analysis supporting this assertion.[9]

Similarly, in *Carmenates v. Bank of Am., N.A.*, No. 8:17-cv-2635-T-23JSS, 2018 WL 659594, at *1 (M.D. Fla. Feb. 1, 2018), the plaintiff brought the same four claims advanced by Plaintiffs here. While ruling on a motion to dismiss, the court stated:

> In this instance, only the [HAMP Approval Claim] appears an attempt to enforce an oral credit agreement. The remaining claims appear based on a duty other than under an oral credit agreement. For example, the plaintiffs infer fraud from Bank of America's charging an inspection fee purportedly prohibited by a Department of Housing and Urban Development guideline.

*Id.* at *3. The court offered no other analysis on this point, and it did not explain how the HAMP Eligibility Claim or the Supporting Documents Claim did not trigger the Banking Statute of Frauds.[10]

This Court is in a different procedural posture. After careful review of the statute's origins and corresponding cases, this Court believes the Banking Statute of Frauds—after full case discovery and considered in this summary judgment posture—encapsulates the HAMP Eligibility Claims and the Supporting Documents Claims.

---

[9] The *Uribe* court later granted summary judgment against the plaintiff under the *Rooker-Feldman* doctrine. *See* Case No. 8:17-cv-2589-VMC (M.D. Fla. Oct. 17, 2018) at Dkt. 59.
[10] The *Carmenates* court later dismissed the complaint with prejudice on *Rooker-Feldman* grounds. *See* Case No. 8:17-cv-2635-T-23JSS (M.D. Fla. July 24, 2018) at Dkt. 50.

Florida based its Banking Statute of Frauds on a similar statute in Minnesota: the Minnesota Credit Agreement Statute, Minn. Stat. § 513.33. *See Puff 'N Stuff of Winter Park, Inc. v. Bell*, 683 So. 2d 1176, 1183 n.2 (Fla. 5th DCA 1996) (Griffin, J., dissenting) (stating that Florida based its statute on Minnesota's statute). Florida's statute uses language that is virtually identical to Minnesota's statute. Because of this, many courts in Florida have recognized that the Minnesota statute and corresponding Minnesota cases provide important context for interpreting the Florida statute. *See, e.g.*, *Brake v. Wells Fargo Fin. Sys. Fla., Inc.*, No. 8:10-cv-338-T-33TGW, 2011 WL 6719215, at *8 n.6 (M.D. Fla. Dec. 5, 2011) ("Minnesota cases are persuasive authority because Florida's banking statute of frauds is patterned upon, and virtually identical to, Minnesota's banking statute of frauds.").

Particularly relevant here is Subsection 3 of the Florida Banking Statute of Frauds, which is identical to Subsection 3 of the Minnesota Credit Agreement Statute. It states:

> The following actions do not give rise to a claim that a new credit agreement is created, unless the agreement satisfies the requirements of subsection (2):
>
> 1.   The rendering of financial advice by a creditor to a debtor;
>
> 2.   The consultation by a creditor with a debtor; or
>
> 3.   The agreement by a creditor to take certain actions, such as entering into a new credit agreement, forbearing from exercising

> remedies under prior credit agreements, or extending installments due
> under prior credit agreements.

Fla. Stat. § 687.0304(3).

The Eighth Circuit interpreted this subsection in *Brisbin v. Aurora Loan Servs., LLC*, 679 F.3d 748, 753 (8th Cir. 2012). There, the plaintiff argued Subsection 3 carved out exceptions to the definition of "credit agreement" given in Subsection 1. *Id.* The Court rejected this construction. *Id.* Instead of listing exceptions to the definition of "credit agreement," Subsection 3 actually provides examples of credit agreements specifically *covered* by the statute. *Id.* This means that the statute applies to financial advice given by the creditor to the debtor, as well as consultations between the creditor and debtor, in the context of credit agreements. If the creditor gave such financial advice orally, then the statute may bar the introduction of such representations. *See Becker v. First Am. State Bank of Redwood Falls*, 420 N.W. 2d 239, 240–41 (Minn. App. 1988) (finding that the Minnesota Credit Agreement Statute barred creditor's financial advice for debtor to reduce indebtedness).

This Court believes the Eighth Circuit's interpretation of Subsection 3 is consistent with the Florida Banking Statute of Fraud's overall purpose, which is "to protect lenders from liability for actions or statements a lender might make in the context of counseling or negotiating with the borrower which the borrower construes as an agreement[.]" *Dixon*, 664 F. Supp. 2d at 1309. The object of

22

statutory interpretation is to ascertain and effectuate the intention of the legislature. *Whynes v. Am. Sec. Ins. Co.*, 240 So. 3d 867, 869 (Fla. 4th DCA 2018) (citing *Borden v. East-European Ins. Co.*, 921 So. 2d 587, 595 (Fla. 2006)). The Court believes the Eighth Circuit's statutory interpretation in *Brisbin* does just that.

Keeping these lessons in mind, the Court will now address the remaining claims in turn. Two of Plaintiffs' remaining claims—the HAMP Eligibility Claims and the Supporting Documents Claims—involve credit agreements as defined by the Banking Statute of Frauds. Because these agreements are not in writing nor signed by the parties, Plaintiffs cannot sue upon them.

### A. The HAMP Eligibility Claims

Pursuant to the HAMP Eligibility Claims, Plaintiffs allege that representatives of Defendant BOA orally told Plaintiffs on the phone that being "past due" on their mortgage loans was a prerequisite for HAMP eligibility. *Zenteno*, Dkt. 100 at 10–11; *Blanco*, Dkt. 17 at 11; *Rodriguez*, Dkt. 103 at 10. Plaintiffs argue "[t]his statement was false as default was not required for HAMP eligibility. [The] BOA loan representative . . . omitted the fact that eligibility was available for HAMP to borrowers if default was reasonably foreseeable." *Zenteno*, Dkt. 100 at 11; *Blanco*, Dkt. 17 at 11; *Rodriguez*, Dkt. 103 at 10. Plaintiffs argue these statements constitute common law fraud.

23

The Court holds that the HAMP Eligibility Claims fall within the purview of the Banking Statute of Frauds. There can be no serious dispute that a loan modification under HAMP constitutes a credit agreement as defined by the statute.[11] The oral representations complained of in the HAMP Eligibility Claims were made in the context of Plaintiffs applying for HAMP loan modifications. As discussed above, Subsection 3 of the statute covers financial advice given by the creditor to the debtor, as well as consultations between the creditor and debtor, in the context of negotiating credit agreements. That is what happened here: Plaintiffs assert Defendant BOA gave financial advice (albeit allegedly incorrect financial advice) to Plaintiffs in their quests to modify their mortgages through HAMP.

The HAMP Eligibility Claims are also tied to another credit agreement: Plaintiffs' existing mortgages. By allegedly telling Plaintiffs to not make their regular monthly mortgage payments, Defendant BOA arguably agreed to forbear exercising its remedies under these prior credit agreements. This, too, is covered by Subsection 3 of the statute. *See* Fla. Stat. § 687.0304 ("The agreement by a creditor to take certain actions, such as . . . forbearing from exercising remedies under prior credit agreements); *see also Figgins v. Wilcox*, 879 N.W.2d 653, 657–58 (Minn. 2016) (holding that bank's statement that debtor did not need to make payments

---

[11] Plaintiffs largely admit this. *See Zenteno*, Dkt. 251 at 4; *Blanco*, Dkt. 232 at 5; *Rodriguez*, Dkt. 228 at 4 ("Plaintiffs agree that permanent loan modification agreements are credit agreements within the meaning of the Banking Statute of Frauds.").

while the parties negotiated refinancing constituted an agreement to "forbear the repayment of money," as well as a "financial accommodation," under the statute).

The Court therefore holds that the HAMP Eligibility Claims are based on representations that fall within the Banking Statute of Frauds. *See Freeman v. Ally Fin. Inc.*, 528 F. Supp. 3d 1038, 1045 (D. Minn. 2021) (stating that plaintiffs cannot maintain actions in which they assert the existence of unwritten credit agreements and their claims are "contingent on proof" of such agreements). For Plaintiffs to bring these claims, then, the credit agreements must be in writing and signed by the parties. There is no such document in any of the three cases. Summary judgment is therefore granted in favor of Defendant BOA for the HAMP Eligibility Claims.

## B. The Supporting Documents Claims

Pursuant to the Supporting Documents Claims, Plaintiffs argue BOA employees falsely informed Plaintiffs by phone that their applications were missing signatures and were "not current." *Zenteno*, Dkt. 100 at 11–12; *Blanco*, Dkt. 17 at 11–12; *Rodriguez*, Dkt. 103 at 11. According to Plaintiffs, the BOA employees repeatedly told them on phone calls that they must submit new application materials to complete their applications for HAMP loan modifications. *Zenteno*, Dkt. 100 at 11–12; *Blanco*, Dkt. 17 at 11–12; *Rodriguez*, Dkt. 103 at 11.

25

Although a closer call than the HAMP Eligibility Claims, the Court holds that the Banking Statute of Frauds applies to the Supporting Documents Claims, as well. The oral statements underlying these claims were made in the context of BOA employees counseling Plaintiffs on their applications for HAMP loan modifications. Plaintiffs seek to make actionable statements of BOA that were part of failed negotiations for modified credit agreements under HAMP. *Brisbin* shows that the Banking Statute of Frauds covers creditors' consultations with debtors regarding credit agreements. 679 F.3d at 753.

Additionally, Plaintiffs allege BOA repeatedly requested these documents "for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure." *Zenteno*, Dkt. 100 at 11–12; *Blanco*, Dkt. 17 at 11–12; *Rodriguez*, Dkt. 103 at 11. In other words, Plaintiffs allege they were damaged by these document requests in the form of being wrongfully denied HAMP loan modifications. Indeed, Plaintiffs' expert stated that the "appropriate damages award is an amount that restores the household financially to where it would had been had it received the HAMP modification with its associated financial benefits." *Rodriguez*, Dkt. 170 at 183. This theory of damages is telling. By alleging that these document requests caused them to wrongfully lose the ability to get HAMP loan modifications, Plaintiffs

have pled the Supporting Documents Claims in such a way that ties the claims to credit agreements under the Banking Statute of Frauds.

In sum, both the HAMP Eligibility Claims and the Supporting Documents Claims are contingent on the existence of unwritten credit agreements. These claims are closely tied to HAMP—whether Plaintiffs' applications for HAMP loan modifications, BOA's handling of those HAMP applications, or BOA's ultimate denial of those HAMP applications. Indeed, Plaintiffs themselves state "the very crux of this case is that Plaintiffs were not given a HAMP modification when they were entitled to receive one, and that Bank of America's lies led to foreclosure." *Zenteno*, Dkt. 251 at 9; *Blanco*, Dkt. 232 at 9; *Rodriguez*, Dkt. 228 at 9. The HAMP Eligibility Claims and the Supporting Documents Claims are therefore actions on credit agreements, and the debtors thus "may not maintain" them because the agreements purportedly arising from the alleged misrepresentations are not in writing nor signed by BOA. *Bracewell v. U.S. Bank Nat. Ass'n*, 748 F.3d 793, 796 (8th Cir. 2014). Summary judgment is granted in favor of Defendant BOA on these claims.

### III.   The Inspection Fee Claims Are Barred by *Rooker-Feldman*.

Federal district courts may not review or reject state-court judgments rendered before the district court litigation began. *See Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). This

rule—known as the *Rooker-Feldman* doctrine— "follows naturally from the jurisdictional boundaries that Congress has set for the federal courts," which are that (1) federal district courts are courts of original jurisdiction, which generally cannot hear appeals, and that (2) only the Supreme Court can reverse or modify state court judgments. *Behr v. Campbell*, 8 F.4th 1206, 1210 (11th Cir. 2021) (cleaned up). "Allowing federal district courts to alter or directly review the judgments of state courts would violate both of those jurisdictional grants." *Id.*

The Eleventh Circuit recently reiterated the limitations of this doctrine in *Behr*, 8 F.4th at 1211. There, the court stated that *Rooker-Feldman* is not "a one-size-fits-all preclusion doctrine for a vast array of claims relating to state court litigation." *Id.* at 1208. The doctrine is instead "confined" to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of these judgments." *Id.* at 1209−10; *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). *Rooker-Feldman* "applies only when litigants try to appeal state court losses in the lower federal courts." *Behr*, 8 F.4th at 1214.

Here, pursuant to the Inspection Fee Claims, Plaintiffs allege "BOA committed common law fraud upon the Plaintiffs when throughout the HAMP application BOA employees omitted the fact that the bank was conducting

unnecessary and improper inspections on their home[s] and charging their account[s] inspection fees." *Zenteno*, Dkt. 100 at 15; *Blanco*, Dkt. 17 at 15; *Rodriguez*, Dkt. 103 at 14. Plaintiffs say BOA improperly charged them for numerous inspection fees over the course of several years. *Zenteno*, Dkt. 100 at 15; *Blanco*, Dkt. 17 at 15; *Rodriguez*, Dkt. 103 at 14. According to Plaintiffs, "[t]hese inspection fees are impermissible under the HUD Servicing Guidelines and are but one example of the fraudulent charges for which BOA applied to Plaintiffs' account *and added to the foreclosure judgment amount*." *Zenteno*, Dkt. 100 at 14; *Blanco*, Dkt. 17 at 14–15; *Rodriquez*, Dkt. 103 at 14 (emphasis added).

This last statement is telling. Each of the Plaintiffs had their homes foreclosed upon in state-court judgments. *Zenteno*, Dkt. 158-27 at 2; *Blanco*, Dkt. 147-25 at 2; *Rodriguez*, Dkt. 141-17 at 2. And in each judgment, the state court included the inspection fees in an itemized list of what each Plaintiff owed to Defendant BOA. *Zenteno*, Dkt. 158-27 at 2; *Blanco*, Dkt. 147-25 at 2; *Rodriguez*, Dkt. 141-17 at 2. The damages Plaintiffs now seek in these federal cases are the same damages ordered in the state-court judgments.

According to the Eleventh Circuit, the claim for relief matters when determining whether *Rooker-Feldman* applies. *See Behr*, 8 F.4th at 1214. While plaintiffs may seek "relief for violations that happened during the state court processes," such as a third party violating a plaintiff's constitutional rights while

29

the state-court proceedings were pending, plaintiffs may not seek "rejection of the state court judgment[s]" themselves. *Id.* at 1213. In effect, *Rooker-Feldman* applies when the federal-court plaintiff is seeking to appeal an adverse state-court judgment. *Id.* at 1214 ("[*Rooker-Feldman*] applies only when litigants try to appeal state court losses in the lower federal courts.")

By requesting damages for these inspection fees, Plaintiffs essentially ask this Court to void and vacate the inspection fees ordered in the state-court foreclosure judgments. This the Court cannot do. The remedies Plaintiffs seek (i.e., repayment of the inspection fees) are direct attacks on the state-court judgments in the foreclosure actions. *See Behr*, 8 F.4th at 1212 ("[T]o be barred by *Rooker-Feldman* requires that it amount to a direct attack on the underlying state court decision." (quoting *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1288 (11th Cir. 2018))). Plaintiffs are state-court losers complaining of injuries caused by prior state-court judgments. The Inspection Fee Claims are therefore barred by *Rooker-Feldman*.

This outcome is not changed by the fact that Plaintiffs now claim the inspection fees were fraudulent. *Rooker-Feldman* "does not prioritize form over substance. It bars all appeals of state court judgments—whether the plaintiff admits to filing a direct appeal of the judgment or tries to call the appeal something else." *Behr*, 8 F.4th at 1211; *see also May v. Morgan Cnty.*, 878 F.3d 1001, 1005 (11th

Cir. 2017) (stating that a "state court loser cannot avoid *Rooker-Feldman*'s bar by cleverly cloaking her pleadings in the cloth of a different claim"). Plaintiffs are directly challenging portions of the state-court foreclosure judgments. If Plaintiffs believe these portions of the judgments are fraudulent, Plaintiffs must go back to state court to argue this.

In sum, even under the Eleventh Circuit's more restrictive view of *Rooker-Feldman*, the Court holds that Plaintiff's Inspection Fee Claims are barred. Summary judgment is granted in favor of Defendant BOA.

## CONCLUSION

The Court **GRANTS** the following Motions for Summary Judgment filed by Defendant Bank of America:

- In *Zenteno*, 8:17-cv-2591, the Court grants Defendant BOA's Motion for Summary Judgment on all claims, Dkt. 248.

- In *Rodriguez*, 8:17-cv-2627, the Court grants Defendant BOA's Motion for Summary Judgment on all claims, Dkt. 225.

- And in *Blanco*, 8:17-cv-2626, the Court grants Defendant BOA's Motion for Summary Judgment on all claims, Dkt. 229.

The Court **DENIES** the following Motions for Summary Judgment filed by the individual Plaintiffs:

- In *Zenteno*, 8:17-cv-2591, the Court denies in its entirety the Plaintiffs' Motion for Summary Judgment, Dkt. 251.

- In *Rodriguez*, 8:17-cv-2627, the Court denies in its entirety the Plaintiffs' Motion for Summary Judgment, Dkt. 228.

- And in *Blanco*, 8:17-cv-2626, the Court denies in its entirety the Plaintiffs' Motion for Summary Judgment, Dkt. 232.

The clerk is directed to close the cases.

   **DONE AND ORDERED** at Tampa, Florida, on November 15, 2021.


   */s/ William F. Jung*
   **WILLIAM F. JUNG**
   **UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record